UNITED STATES DISTRICT COURT
EASTERN DISTRICT OF WISCONSIN

ONEIDA SEVEN GENERATIONS
CORPORATION and GREEN BAY
RENEWABLE ENERGY, LLC,

        Plaintiffs,

v.                                                                     Case No. 16-CV-1700

CITY OF GREEN BAY,

        Defendant.

## DECISION AND ORDER GRANTING MOTION TO DISMISS

      Plaintiffs Oneida Seven Generations Corporation (OSGC) and Green Bay Renewable Energy, LLC, (GBRE) filed this action against the City of Green Bay pursuant to 42 U.S.C. § 1983 alleging the City violated their rights to substantive and procedural due process when the Common Council voted to revoke a conditional use permit it had granted only one year earlier. The case is before the Court on the City's motion to dismiss for failure to state a claim pursuant to Rule 12(b)(6) of the Federal Rules for Civil Procedure. The City also contends that the complaint fails to allege facts showing GBRE has any interest or suffered any loss in the transaction and that OSGC lacks capacity to sue under the laws of the Oneida Nation under which it was chartered. For these reasons, as well, the City argues that the claims against it should be dismissed.

      In deciding a motion to dismiss, the court must accept as true all well-pleaded factual allegations of the complaint, drawing all reasonable inferences in favor of the pleading party. *Moranski v. General Motors Corp.*, 433 F.3d 537, 539 (7th Cir. 2005). I therefore begin with a summary of those allegations.

## ALLEGATIONS OF THE COMPLAINT

On March 1, 2011, Plaintiff Oneida Seven Generations Corporation (OSGC) obtained a conditional use permit (CUP) from the City of Green Bay, Wisconsin to build a facility to convert municipal solid waste into electricity and other useful products through a process known as pyrolysis. The facility, which was to be built on Hurlbut Street near the mouth of the Fox River, was designed to first sort and shred municipal solid waste, and then convey the waste to the pyrolysis unit, which would heat the waste to extremely high temperatures in an oxygen-starved environment. The process produces "syngas," which is chemically similar to natural gas or methane. After being scrubbed, the syngas would then fuel three generators (large internal combustion engines) to produce electricity. Compl. ¶¶ 2–3.

OSGC had applied for the CUP after it learned that the City was extremely interested in development of a waste-to-energy facility within the City limits of Green Bay. Representatives of OSGC met with staff of the City's Economic Development and Planning Departments to select a site which OSGC later purchased. OSGC then submitted a lengthy application in which it described the project, addressed potential environmental impacts, and acknowledged the oversight and enforcement responsibility that the Wisconsin Department of Natural Resources (DNR) would exercise over its operations. City planning staff reviewed the information and issued a report to the City's Plan Commission which recommended granting the application. After consideration of the staff report, a presentation by OSGC, and a public hearing on the matter, the Plan Commission unanimously recommended that the City approve the CUP conditioned upon the facility complying with all federal and state environmental regulations. The issue then went to the full Common Council which held a public hearing similar to the hearing held before the Plan Commission.

2

Following the OSGC presentation and public comments, the Common Council voted ten-to-one to approve the permit. *Id.* ¶¶17–31.

After the City approved the application for the CUP, OSGC spent a significant amount of money to purchase equipment for the new facility and pursue the additional permits it needed from the DNR, the U. S. Department of Energy and other state and local government agencies. On July 14, 2011, the Safety and Buildings Division of the Wisconsin Department of Commerce conditionally approved OSGC's plan, noting that the owner was "responsible for compliance with all code requirements." On August 3, 2011, OSGC's detailed site plans and building plans were approved by the City and a building permit was issued. In September 2011, the DNR issued permits and approvals for the facility under the State's clean air and solid waste laws. The DNR issued a formal Environmental Analysis which concluded that approval of the facility was not a "major action" and would not have significant environmental effects. The U.S. Department of Energy likewise completed its Environmental Assessment and issued a "Finding of No Significant Impact." With all the required approvals in hand, OSGC proceeded with preparatory construction work. *Id.* ¶¶ 32–40.

In the meantime, citizen opposition to the project had grown more active. At an April 10, 2012 meeting of the Common Council the opposition groups accused OSGC of lying to the City in applying for the CUP by claiming that the facility would have no smokestacks and would produce no emissions. Responding to political pressure, the Common Council voted to hold a public hearing regarding the CUP and to "continue further information." *Id.* ¶ 44. The Council directed the Plan Commission to hold a public hearing to "determine if the information submitted and presented to the Plan Commission was adequate for it to make an informed decision whether or not to advance the Seven Generation Conditional Use Permit (CUP) that was recommended." *Id.* ¶ 45.

3

The meeting before the Plan Commission was held on October 3, 2012. After hearing from all parties, including City Planning Director Rob Strong who was directly involved in reviewing the application, the Commission concluded there had been no misrepresentation. In a report to the Common Council, the Plan Commission stated:

> Based on the information submitted and presented, the Plan Commission determines that the information provided to the Plan Commission was not misrepresented and that it was adequate for the Commission to make an informed decision, and recommends that the CUP stand as is. The Commission further determines that the information the Plan Commission received was adequate, and based upon information then available, that the Plan Commission did understand that there were emissions and venting as a part of the system, and therefore made sure that the Seven Generations Corporation would need to meet the requirements of the EPA and DOE, as well as meeting the requirements of the municipal code through a normal process of give and take.

*Id.* ¶ 51.

Despite the unequivocal report from the Plan Commission, a letter from OSGC counsel that any effort by the City to revoke the CUP would be met with a damages claim for millions of dollars, and the advice of the City Attorney that there was no legal basis for the City to revoke the CUP, the Common Council voted on October 16, 2012, to reject the conclusions of the Plan Committee and to rescind the CUP previously granted to OSGC by a vote of seven to five. Two weeks later the City Attorney sent a letter to OSGC stating that the Council had rescinded the CUP because OSGC had made "false statements and misrepresentations" to the City "relat[ing] to the public safety and health aspect of the Project and the Project's impact upon the City's environment" and regarding "emissions, chemicals, and hazardous materials." The letter did not identify the particular statements that were false, however, nor did it explain the basis for the City's determination that any statements were false. *Id.* ¶¶ 55–60.

4

On November 14, 2012, OSGC requested an administrative appeal pursuant to Section 68.10 of the Wisconsin Statutes, and requested a hearing under Section 68.11. The City concluded that the hearings already conducted substantially complied with Section 68.11, however, and summarily denied the appeal. OSGC then commenced an action for certiorari review of the City's decision in the Circuit Court for Brown County, alleging that the City "had arbitrarily and capriciously rescinded the permit based on an implied, unwritten condition; had deprived OSGC of its vested right to develop the facility; had rescinded the permit without substantial evidence of misrepresentation; and had acted arbitrarily and unreasonably." *Id.* ¶¶ 61–63.

OSGC's petition for certiorari was denied by the Circuit Court for Brown County. OSGC appealed the court's decision to the Wisconsin Court of Appeals, which reversed the Circuit Court's decision in a twenty-page decision issued on March 25, 2014. Notwithstanding its stated reluctance to "interfere in such discretionary functions" as the decision to revoke a CUP, the Court of Appeals nevertheless concluded that the City's decision could not stand. ECF No. 1-1, ¶¶ 20, 43. Characterizing the City's action as "fickle and inconstant," the Court concluded there was no basis for the City's finding that OSGC had made any misrepresentations to the City. The Court emphasized that the City had not even mentioned the Plan Commission's report or explained why it had not adopted it, since the Plan Commission was in a much better position to determine whether misrepresentations had been made. Given the City's failure to identify the false statement allegedly made by OSGC or consider the Plan Commission's report, the Court concluded:

> we cannot help but believe the City's decision was not based on a rational analysis of the statements [OSGC] made to the Plan Commission, but the public pressure brought to bear on the Common Council after the CUP had been issued.

5

*Id.* ¶ 27. The City filed a petition for review of the Court of Appeals decision with the Wisconsin Supreme Court, which granted the petition but also concluded, with the Chief Justice dissenting, that the City's action was not supported by substantial evidence and affirmed the decision of the Court of Appeals in a decision issued on May 20, 2015. ECF No. 1-2.

Although it ultimately prevailed in the state courts, OSGC never requested reissuance of the CUP. According to the complaint, "OSGC proposed the waste-to-energy project when it did because of the availability of federal, state, and local grants, tax deductions and other incentives." Compl. ¶ 73. "Unfortunately," the complaint alleges, "those opportunities have expired, such that the project is no longer economically viable." (*Id.*) Instead, OSGC and GBRE, the wholly owned indirect subsidiary of OSGC which was formed for the purpose of developing the facility, filed this lawsuit pursuant to 42 U.S.C. § 1983, in an attempt to recover $5.2 million in out-of-pocket expenses OSCG incurred in developing the project, $16 million in profits they claim the facility would have generated, and the attorneys' fees incurred in the state and federal court actions to vindicate their rights.

**ANALYSIS**

**A. Threshold Issues**

As an initial matter, the City argues that OSGC lacks the capacity to sue and that the complaint fails to allege any facts that show the GBRE has any claim against it. The City's lack of capacity argument is based on OSGC's status as a tribal corporation chartered under the laws of the Oneida Nation, a federally recognized Indian tribe. According to the OSGC Corporate Charter, the Charter was granted by the Oneida Business Committee under the authority vested in it by the Oneida General Tribal Council. Under the Oneida Constitution and By-Laws, the General Tribal

Council is the governing body of the Oneida Nation and the Business Committee, consisting of nine elected members, and is empowered to perform such duties as may be authorized by the General Tribal Council.

The City contends that on December 15, 2013, the General Tribal Council voted to dissolve OSGC. Although the Business Committee has begun the process of dissolution, it has apparently not been completed. Nevertheless, the City argues, based upon amendments of OSGC's corporate charter and the tabling of a motion that would have expressly authorized OSGC to continue its litigation against the City, that it lacks authority to bring this action. Although the same argument applies to GBRE, a wholly owned subsidiary of OSGC, the City argues that the complaint fails to allege that GBRE suffered any injury in fact that would give it standing to sue in any event. For these reasons, the City argues the action should be dismissed.

Neither argument warrants dismissal at this stage of the proceedings. The City's argument that OSGC, and GBRE too, lack capacity to sue is predicated on facts outside the pleadings and the attachments thereto. The City has attempted to support its argument by submitting documents concerning internal tribal governance and affairs. OSGC challenges the City's interpretation of the documents and none provide unequivocal support for the City's position. For the court to fully consider whether OSGC and GBRE lacked capacity, it would have to convert the pending motion to dismiss to one seeking summary judgment and, even then, the answer may not be sufficiently clear to allow a ruling as a matter of law. I therefore decline to do so.

As for the City's contention that the complaint fails to allege that GBRE suffered any injury in fact, I note that the complaint refers to OSGC and GBRE collectively as OSGC. Thus, any injury that OSGC suffered the complaint attributes to GBRE as well. More specifically, the complaint

7

alleges that GBRE was formed for the purpose of developing the facility. Given this allegation, it is not unreasonable to infer that at least some of the development costs for and profits from the project would have been borne by and later received by GBRE. At least at this stage, this is sufficient to withstand a motion to dismiss.

**B. Procedural Due Process**

The complaint alleges that the City deprived the defendants of their right to procedural due process. The Fourteenth Amendment provides, as relevant here, "nor shall any State deprive person of life, liberty, or property, without due process of law." U.S. Const. amend. XIV, § 1. To demonstrate a procedural due process violation of a property right, the plaintiff must establish that there is "(1) a cognizable property interest; (2) a deprivation of that property interest; and (3) a denial of due process." *Hudson v. City of Chicago*, 374 F.3d 554, 559 (7th Cir. 2004) (citation omitted). It is with respect to the third element of its procedural due process claim that OSGC's complaint fails.

To be sure, OSGC was entitled to due process. *River Park, Inc. v. City of Highland Park*, 23 F.3d 164, 166 (7th Cir. 1994). But this was essentially a zoning case, and "the procedures 'due' in zoning cases are minimal." *Id.* (citing *Eastlake v. Forest City Enters., Inc.*, 426 U.S. 668 (1976)). "Municipalities need not use adjudicative procedures to make zoning decisions." *Coniston Corp. v. Hoffman Estates*, 844 F.2d 461, 467–68 (7th Cir.1988) ("The decision whether and what kind of land uses to permit does not have the form of a judicial decision."). Here, there is no dispute that OSGC received notice and a hearing at which it was able to address the allegations that it had misrepresented certain features of the project prior to the initial vote granting its application for the CUP. But more importantly, the procedural protection afforded OSGC's interest in the CUP did

8

not end with the decision of the Common Council. OSGC sought judicial review in state court via writ of certiorari and ultimately succeeded in having the City's decision rescinding its CUP overturned. "A person contending that state or local regulation of the use of land has gone overboard must repair to state court." *River Park*, 23 F.3d at 167. This is because "when the claim depends on the due process clause, state litigation may supply that process." *Id.* (citing *Eastlake*, 426 U.S. at 679 n.13).

That is precisely what occurred here. Whatever procedural protection OSGC believes it was denied by the City was supplied by the availability of judicial review in the state courts, which ultimately reversed the City's decision to rescind the previously issued CUP. The fact that the project was no longer economically viable by the time the process was complete does not change the result. Leaving aside the question how a project OSGC claims would have generated $16 million in profit could have lost its economic viability in five years, OSGC successfully utilized the procedural safeguards that were available for restricting the City's authority to impose zoning limitations on the use of its land. OSGC's procedural due process claim therefore fails.

**C. Substantive Due Process**

The complaint also asserts a claim that the City deprived the defendants of substantive due process. "Substantive due process is admittedly an 'amorphous' concept." *Bettendorf v. St. Croix Cnty.*, 631 F.3d 421, 426 (7th Cir. 2011) (quoting *Tun v. Whitticker*, 398 F.3d 899, 900 (7th Cir. 2005)). "It is perhaps for this reason that its scope remains 'very limited.'" *Id.* (citing *Washington v. Glucksberg*, 521 U.S. 702 (1997)). "A government entity must have exercised its power without reasonable justification in a manner that 'shocks the conscience' in order for a plaintiff to recover on substantive due process grounds." *Id.* (quoting *Rochin v. California*, 342 U.S. 165 (1952)).

9

In *CEnergy-Glenmore Wind Farm No. 1 v. Town of Glenmore*, 769 F.3d 485 (7th Cir. 2014), a wind farm developer claimed that the Town Board had deprived it of substantive due process by delaying action on its application for building permits for the windmill structure so as to cause the developer to lose a lucrative contract for the sale of the power the farm would have generated. This court dismissed the claim pursuant to Federal Rule of Civil Procedure 12(b)(6), and the Seventh Circuit affirmed on the grounds that "the Board's actions were not arbitrary in the constitutional sense and because CEnergy did not seek recourse under state law as required by a long line of cases in this circuit." *Id.* at 488. On the issue of arbitrariness, the Court noted that "a land-use decision must 'shock the conscience' to run afoul of the Constitution." *Id.* (citing *Bettendorf*, 631 F.3d at 426). The Court also noted that it had "suggested that the action must have been 'arbitrary and capricious' or 'random and irrational.'" *Id.* (internal citations omitted). In yet another formulation, the Court noted that "the Supreme Court has explained that a land-use decision must be arbitrary to the point of being 'egregious' to implicate substantive due process." *Id.* (citing *City of Cuyahoga Falls v. Buckeye Cmty. Hope Foundation*, 538 U.S. 188, 198 (2003)). Applying the standard to the facts alleged in CEnergy's complaint in that case, the Court held that "the Glenmore Town Board's decision to delay action on CEnergy's building permit requests could not have been arbitrary in the constitutional sense." *Id.* "As far as the Constitution is concerned," the Court observed, "popular opposition to a proposed land development plan is a rational and legitimate reason for a legislature to delay making a decision. *See River Park*, 23 F.3d at 167 (explaining that 'the idea in zoning cases is that the due process clause permits municipalities to use political methods to decide')."

10

Likewise in this case, the City Council's decision to rescind the CUP was in response to popular opposition which developed after the permit was issued. The Council determined that OSGC had made several misrepresentations about the project in the course of the public hearings on its application for the CUP. According to the decision of the Wisconsin Supreme Court attached to the complaint, the Council specifically focused on statements made by representatives of OSGC concerning emissions from the proposed facility, smoke stacks and the successful utilization of the same technology in other parts of the country. 2015 WI 50, ¶ 53. The majority opinion carefully analyzed the evidence bearing on the oral representations made by OSGC's CEO, engineer, and project manager at the public hearing. *Id.* at ¶¶ 54–79. Based upon its review, the Court concluded that "the City's decision to rescind the conditional use permit was not based on substantial evidence." *Id.* at ¶ 81. The Court explained: "In conducting a certiorari review to determine whether there was substantial evidence to support a decision, we consider the evidence in context. Considering the context, we determine that based on the evidence presented, the City could not reasonably conclude that the statements by Oneida Seven's representative to the City government regarding the proposed facility's emissions and hazardous materials, its stacks, and its technology were misrepresentations." *Id.* Chief Justice Roggensack filed a dissenting opinion in which she argued that the majority had failed to accord the City Council's finding that OSGC had made misleading statements. She noted that the Common Council was not making a claim for actionable misrepresentation, but instead relied on the misleading statements as an equitable basis for rescinding the CUP. *Id.* at ¶¶ 82–84, 99 (Roggensack, C.J., dissenting).

Even though the Wisconsin Supreme Court ultimately concluded that the Council's decision was not based on substantial evidence and could not stand, this does not mean it was arbitrary in a

11

constitutional sense. Something more than a favorable state court ruling is needed in order for a municipal board's decision on a zoning issue to be found to violate a property owner's right to substantive due process. *See Harding v. County of Door*, 870 F.2d 430, 432 (7th Cir. 1989) ("Although the Wisconsin Court of Appeals ultimately determined that the Board's interpretation of the zoning ordinance was erroneous, this fact does not transform the Board's rational decision into an irrational one."). It is noteworthy that both the trial court and the Chief Justice found sufficient evidence to support the action taken by the City. Also of note is the fact that OSGC did not seek an award of actual attorneys' fees and costs pursuant to Section 895.044 of the Wisconsin Statutes on the grounds that the City's defense was asserted in bad faith or with intent to harass or injure, or that the City or its attorneys knew or should have known that its position was without any reasonable basis in law or equity.

In *Eichenlaub v. Township of Indiana*, town officials were alleged to have applied subdivision requirements to the plaintiffs' property that were not applied to other parcels, pursued unannounced and unnecessary inspection and enforcement actions, delayed certain permits and approvals, improperly increased tax assessments, and maligned and muzzled the plaintiffs. 385 F.3d 274, 286 (3d Cir. 2004). Noting that the complaints were typical of the kind of disagreement that is frequent in planning disputes and that there was no allegation of corruption or self-dealing, the court affirmed the district court's conclusion that the "misconduct alleged here does not rise sufficiently above that at issue in a normal zoning dispute to pass the 'shocks the conscience test.'" *Id.*

Similarly in this case, there was no allegation of corruption or self-dealing by Council members who voted in favor of rescinding the CUP. The allegations of misrepresentation were

based on the arguably misleading oral statements that OSGC's representatives made, but which a majority of the Wisconsin Supreme Court concluded, in context and considering the written statements and more direct involvement with the Plan Committee, did not amount to intentional misrepresentation of a kind that justified rescinding the CUP. That the analysis of a majority of the Council members failed to consider the entire context when confronted with angry constituents is hardly shocking.

Finally, the fact that OSGC ultimately prevailed and could have completed the project had it chosen to do so also makes the City Council's decision less shocking or egregious than a substantive due process violation requires. There is no suggestion that the City Council members were aware that delay would essentially kill the project because it would lose whatever economic viability it might have had. In the final analysis, the City's action caused a delay in the project; it was apparently a change in other factors over which the City had no control that caused OSGC to abandon it.

## CONCLUSION

For the reasons set forth above, the City's motion to dismiss pursuant to Rule 12(b)(6) for failure to state a claim is granted. The Clerk is directed to enter judgment accordingly.

**SO ORDERED** at Green Bay, Wisconsin this 6th day of June, 2017.

                                                s/ William C. Griesbach
                                                William C. Griesbach, Chief Judge
                                                United States District Court